SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**LEWIS S. BURKHART, OSB #082781**
Assistant United States Attorney
Lewis.Burkhart@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:25-cr-00284-AB |
| | 3:25-mj-253 |
| v. | |
| | **GOVERNMENT'S MEMO IN** |
| **JULIE MIKELA WINTERS,** | **SUPPORT OF PRETRIAL DETENTION** |
| Defendant. | |

I.     FACTS

On June 24, 2025, the defendant attended a contentious protest at the ICE building. At around 11:00 pm, the protest began to get more agitated. Federal Protective Service (FPS) officers and ICE officers engaged the protestors with less than lethal means.

Approximately fifteen minutes later, FPS officers saw the defendant, wearing a mask with bunny type ears approach the ICE driveway and gate. The defendant had a backpack and

initially took cover behind a post. ICE video surveillance captured the defendant remove at least one unknown item from her bag. See screenshots.



From a different ICE surveillance camera, the defendant approached the gate. See screenshots.

**Government's Memo in Support of Pretrial Detention**                                    **Page 2**



The defendant was not captured by ICE surveillance cameras while she was at the vehicle gate. At least one federal officer saw the defendant attempting to place a lock on the gate to prevent the gate from opening. From an alternative camera from inside the ICE facility gate, an explosion is seen while the defendant is the sole individual at the gate. Officers later recovered a spent "Whistling Worm" firework in the area. See surveillance screenshot.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

**Government's Memo in Support of Pretrial Detention**                                                   **Page 3**



The defendant fled from the gate and took cover behind the same pillar. Federal officers gathered to attempt to arrest the defendant for causing the explosion and attempting to lock the gate. The defendant fled to the northeast when she was challenged by the federal officers. When confronted by the officers, she brandished a twelve-inch butcher knife and began to move the knife back and forth at the officers. ICE surveillance video captured the defendant with the knife exposed threatening the federal officers. See screenshot.

/ / / /

/ / / /

/ / / /

/ / / /



A neighbor watching the confrontation from a nearby apartment building balcony recorded the confrontation. The individual posted the video on social media and it was obtained by law enforcement. Below are screenshots showing the confrontation from the social media video, including a zoomed in screen capture showing the knife.

/ / / /

/ / / /

/ / / /

/ / / /



**Government's Memo in Support of Pretrial Detention**     **Page 6**

The defendant the moved to the east and the officers continued to follow her. The officers yelled at the defendant to "drop the knife!" The defendant transferred the knife to her non-dominate hand and threw the knife at an FPS officer with a sidearm throw, missing the FPS officer by only a few feet. The officer believes that the defendant threw the knife at his head. See screenshots from the social media video.






One of the FPS officers responded by deploying his taser and the defendant fell to the ground. See screenshot.



/ / / /

**Government's Memo in Support of Pretrial Detention**                                                                 **Page 8**

The FPS officers moved in and attempted to place the defendant under arrest. The defendant attempted to remove a second knife from her waistband as the FPS officers frantically tried to place her under arrest. The scene turned chaotic as other protestors attempted to intervene. Finally, after an extended struggle, the officers placed the defendant in handcuffs and escorted her back to the office. The individual filming this portion of the incident began to duck down below the balcony and the camera misses the majority of the resisting, but below is one screenshot showing other protestors moving and the struggle with the defendant.



////

**Government's Memo in Support of Pretrial Detention**                                      **Page 9**

Federal officers recovered both the knife that Winters threw at the officers and the knife she tried to remove from her waistband. See photos.


*(Brandished and Thrown Knife)*


*(Knife Removed From Waistband)*

The FBI interviewed the defendant after the incident. The defendant stated she had done nothing wrong and lived across the street from the ICE building. She claimed she was trying to sleep when bombs continually went off across the street. She said she was tased and beaten up

**Government's Memo in Support of Pretrial Detention**             **Page 10**

but had nothing else to say. The defendant did not explain why she covered her face with a mask, attempted to light some sort of incendiary device, why she attempted to lock the ICE gate, why she brandished a large knife at the officers, nor why she threw a knife at the ICE officer.

## II.     PROCEDURAL HISTORY AND PRETRIAL VIOLATIONS

### A. Procedural History

The defendant was initially charged by Complaint with Assault (18 U.S.C. § 111(a)(1)) on June 25, 2025. The defendant made her initial appearance on June 26, 2025 in front of United States Magistrate Judge Youlee You. The government sought her continued detention as a risk of non-appearance and a danger to the public, and the defendant sought release. A central concern immediately raised was the defendant's subsidized housing location across the street from the ICE building and the defendant's desire to return to her home. Judge You ordered the defendant to be detained as a danger to the public.

On July 1, 2025, the defendant was indicted for two counts: attempted assault on a federal officer and intimidation of a federal officer with a dangerous weapon.

On July 8, 2025, the defendant was arraigned on the indictment and once again sought her release in front of United States Magistrate Judge Stacie Beckerman. Over the government's objection, Judge Beckerman released the defendant to the Northwest Regional Reentry Center (NWRRC). During the hearing, the defendant made it clear she wished to return to her residence. Judge Beckerman rejected her request to return to her residence. Judge Beckerman made it clear to the parties that if the wait was too long for the NWRRC, that she would support release to another location, such as Bybee Lakes. After the hearing, the parties were told the wait to enter the NWRRC would be several months. Arrangements were made for the defendant to be released to Bybee Lakes and Judge Beckerman ordered her release on July 17, 2025.

**Government's Memo in Support of Pretrial Detention**                                               **Page 11**

On August 1, 2025, the defendant returned to court once again asking to return to her residence. The government once again opposed. United States Magistrate Judge John Jelderks allowed the defendant to go back to her residence for only two hours to collect her personal items. He denied her request to move home, but said if she performed well for several months that the Court would consider allowing her to return home.

On August 17, 2025, Pretrial Services was notified that the defendant was no longer living at Bybee Lakes and moved back into her residence in violation of pretrial release conditions. This location is across the street from the ICE building and was discussed at every court appearance the defendant made. It was made abundantly clear that she was not allowed to move back into her residence, but the defendant chose to violate her conditions of release.

Pretrial Services Officer Peru learned that the defendant was no longer allowed to stay at Bybee Lakes due to numerous incidents and program violations she had at the facility. Via e-mail, the defendant told Officer Peru that a Portland Police officer gave her permission to move back into her residence after she was assaulted in downtown Portland.

The United States contacted the Portland Police and Multnomah County Sheriff's office to see if there were any reports of the defendant being a victim of an assault. There are no reports or information the defendant was a victim of an assault. Per defense counsel, the defendant said she generally reported the assault to an officer and the officer told her to "go home." If the incident even happened, an officer telling her to go home is not giving the defendant the authority to violate her federal release conditions. The defendant took the vague purported statement to blatantly violate her pretrial conditions. She was given half an inch and took it a mile.

Officer Peru and the government sought a summons to bring the defendant to court over her pretrial violations. However, Judge You ordered an arrest warrant.

While on release, the defendant posted videos on social media discussing her situation. During the videos, the defendant displayed her distaste and dislike of prosecutors and federal law enforcement. More troubling, on August 19, 2025, defendant released a video that began with her complaining about her case, her sentencing exposure, but turned more radical. She said, "the fucking Jihad needs to begin and we need to make it happen."

### B. August 20, 2025 Incident

Initially, Officer Peru set a meeting at Pretrial Services on August 20, 2025 so the defendant could be served the summons. The defendant tried to negotiate with Officer Peru and get a guarantee that she would not be arrested if she showed up for her pretrial meeting. Officer Peru refused to make a deal with her. With Judge You deciding to order a warrant and not a summons, the U.S. Marshals were notified and asked to serve the arrest warrant when the defendant arrived at Pretrial Services. Two Marshals arrived in the lobby of Pretrial Services and attempted to place her under arrest. The incident was captured by body cameras. The defendant immediately became hostile. She then bull rushed the Marshals and began to fight the Marshals. The Marshals struggled with her for several minutes as she continued to fight back and not let the officers place her in handcuffs. With the assistance of several other Marshals, they were able to get handcuffs on the defendant and escort her to a Marshal holding cell.

A short time later, several Marshals went to check on the defendant. The defendant had a mental health crisis and engaged in serious self-harm. The Marshals went in and began to provide immediate medical assistance. After approximately thirty to forty-five seconds, the defendant began to take labored breaths. The Marshals placed her in a recovery position on her

**Government's Memo in Support of Pretrial Detention**                                                      Page 13

side. Due to the medical incident, the Marshals removed the handcuffs and belly chain as they waited for medical personnel to respond. As soon as the restraints were removed, the defendant returned to fighting the Marshals. She began kicking the Marshals and flailing at them. The Marshals attempted to keep her in the recovery position and stop her from resisting. Portland Fire and AMR personnel arrived to assist. The defendant screamed, "You should have let me die!" and "You're trying to kill me!"

While the medical personnel tried to provide aid, the defendant ripped off the blood pressure cuff cord and began fighting with the Marshals again. The Marshals tried to place handcuffs on the defendant again, and she grabbed AV2 (a U.S. Marshal) by the hair at the base of her scalp and began to whip AV2 around by AV2's hair. AV2 could not get the defendant to stop pulling her hair and free her head from the grip. A different Marshal delivered several close hand strikes to the defendant's legs, and she finally let go of AV2. AV2 suffered pain and soreness from the pulling hair.

The defendant remained completely uncooperative as she was taken to the hospital. She remained uncompliant at the hospital by removing IV's and refusing medical care. The defendant remained at the hospital overnight for a psychological exam.

C. **Pretrial Release Revoked**

The defendant appeared in court on August 21, 2025 in front of Judge You. The defendant requested a set over because she had not received sufficient time to meet with her lawyers. She appeared again on August 25, 2025 and admitted to violating her pretrial release conditions. Judge You revoked the defendant's pretrial release.

### III. CRIMINAL HISTORY

The defendant has a relatively limited criminal history. In 2014, she was convicted of a false reporting in Lincoln, Nebraska. In 2019, she pled guilty to a DUII Diversion in Multnomah County but completed her diversion and the case was dismissed.

#### A. Multnomah County Assault on a Public Safety Officer

Defendant was involved in another troubling incident on December 7, 2024 and the incident bears similarities to the defendant's violent and aggressive behavior towards law enforcement and medical personnel in the more recent August 2025 events. In December 2024, defendant was involved in an incident and police were dispatched to assist with a "combative subject." An officer arrived scene and the defendant initially appeared calm. The defendant expressed her unhappiness with the police's response to a burglary she reported earlier. She began to demand a "courtesy transport" to her residence. The officers explained they could not give a courtesy transport to her. The officer provided the defendant his business card and began to walk away. The defendant then ran at the officer at a full sprint and tackled the officer. The defendant swung her arms at the officer's face and pushed the officer down. During the fight, the officer's glasses and earpiece were both broken. The Portland officers struggled with the defendant until they finally got her handcuffed.

The defendant suffered some injuries during the scuffle and was placed into an AMR ambulance for precautions. Portland officers handcuffed one of her hands to the gurney. During the transport, the defendant attempted to hit one of the paramedics. Paramedics then sedated her.

At the hospital, the defendant removed her IV and ran out of her hospital room attempting to escape. Two officers grabbed the defendant and escorted her back to the hospital room and handcuffed her to the bed.

A Portland Police supervisor later interviewed the defendant about the use of force. The defendant told the officer when the police walked away from her, she felt there was nothing else she could do but run at them. She admitted to grabbing the officer, but refused to answer any more questions.

The defendant was charged by Information in Multnomah County Circuit case number 24CR64708. The case languished with the State's inability to get the defendant a court appointed attorney. Multnomah County finally indicted the defendant on August 22, 2025 and the case is pending.

### B. Capital Police Investigation

On June 9, 2025, North Dakota Senator Kevin Cramer's office received an e-mail from an individual making threatening statements. The sender's e-mail address was listed as "eatadick@republikklanmustdie.com." The message states, "You fucking diagusting [sic] lump of whyte [sic] supremacist garbage. I live in fargo [sic] and i [sic] will find you if you try and take any more food from these childrens [sic] mouths. do [sic] you understand? There will be a nice construction of 4x4's with a secure climbing rope w [sic] youe [sic] name on it. What the fuck is wrong w [sic] you you [sic] heartless soulless shitbag?" The message is obviously concerning by first the e-mail address which seems to say that all Republicans must die. Further, the vague threat about 4x4's with a rope appears to be a threat to hang Senator Cramer.

The Capital Police began an investigation into the sender given the threats. The IP address from the sender comes back to a T-Mobile phone number. T-Mobile subscriber information shows the phone is in the defendant's mother's name. When the defendant was arrested on December 7, 2024, the defendant provided the same T-Mobile phone number subscribed to her mother as her number.

## IV.  LAW AND ARGUMENT

A defendant shall be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need be proven by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f)(2)(B). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *Winsor*, 785 F.2d at 756.

The defendant's performance on pretrial release was a complete failure. Her failures on release center around her inability to abide by orders. She was given a huge gift by Judge Beckerman to be released from custody into Bybee Lakes. However, not understanding the benefit she received, she turned to social media to complain and not take advantage of being out of custody. Further, she could not abide by the rules at Bybee Lakes and was not allowed back.

She was under the mistaken belief that she could negotiate how she came into meet with her pretrial officer. She claimed that an officer's alleged statement "to go home" was sufficient to allow her to supersede her federal release conditions.  The reality is that the defendant is only listening to what she wants to hear.

Throughout the pendency of this case, the government expressed a concern over the defendant's mental health.[1] Her actions are such that the government has significant concerns

---

[1] It is possible that drugs and alcohol may be involved and explain the defendant's erratic behavior. However, beyond her 2019 DUII, the government has not seen any evidence the defendant is using drugs and/or alcohol.

**Government's Memo in Support of Pretrial Detention**                                    **Page 17**

about what is causing her criminality and inability to abide by conditions. She had a serious self-harm incident after her last arrest and was saved by the Marshals. Her response to being saved? She assaulted one Marshal and attempted to assault several others.

Both pretrial and the government requested the defendant obtain a new mental health evaluation from a legitimate professional and then abide by any conditions ordered. It is possible that release may be appropriate if the defendant is properly diagnosed and medicated for a significant period of time. What the defendant is asking for is setting her up for another failure on release because the underlying cause for her actions is not being treated.

## V.     CONCLUSION

For the forgoing reasons, the Defendant should not be released. There are no conditions or combination of conditions that can protect the public or herself. She is a flat-out danger that had three violent encounters with law enforcement in the last ten months.

The defendant has issues, likely due to mental health, that are not being treated. To release her without fixing the root cause of her actions will result into her violating her conditions again.

Dated: September 11, 2025                                  Respectfully submitted,

                                                           SCOTT E. BRADFORD
                                                           United States Attorney

                                                           */s/Lewis S. Burkhart*_____
                                                           LEWIS S. BURKHART, OSB #082781
                                                           Assistant United States Attorney