SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**LEWIS S. BURKHART, OSB #082781**
Assistant United States Attorney
Lewis.Burkhart@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:25-cr-00284-MTK** |
| | **3:25-cr-00390-MTK** |
| v. | |
| | **GOVERNMENT'S SENTENCING** |
| **JULIE MIKELA WINTERS,** | **MEMORANDUM** |
| **Defendant.** | |

The defendant rages against authority and struggled on supervision. Her criminal history

surrounds assaults and threats to law enforcement. The United States agreed to a credit for time

served sentence believing the defendant would remain in custody post-plea and would have

served approximately six months imprisonment, which would be the low-end of the expected

guidelines. While the United States was surprised by her release, we stand by our plea agreement

of credit for time served, despite the fact the Court modified the expected plea deal by releasing

the defendant post-plea.

**Government's Sentencing Memorandum**                                                    **Page 1**

## I.    FACTS

### a. <u>25-cr-00284</u>

On June 24, 2025, the defendant attended a contentious protest at the ICE building. At around 11:00 p.m., the protest began to get more agitated. Federal Protective Service (FPS) officers and ICE officers engaged the protestors with less than lethal means. (PSR ¶¶ 27-28).

Approximately fifteen minutes later, FPS officers saw the defendant, wearing a mask with bunny type ears approach the ICE driveway and gate. The defendant had a backpack and initially took cover behind a post. ICE video surveillance captured the defendant remove at least one unknown item from her bag.[1]  (PSR ¶28). See surveillance screenshots.

 

---

[1] Investigators believe the defendant removed a chain lock and/or a firework from her bag.

**Government's Sentencing Memorandum**                                **Page 2**

 

From a different ICE surveillance camera, the defendant is seen approaching the gate.

See screenshots.



The defendant was not captured by ICE surveillance cameras while she was at the vehicle gate. At least one federal officer believed the defendant attempted to place a lock on the gate to prevent the gate from opening. From an alternative camera from inside the ICE facility gate, an explosion is seen while the defendant is the sole individual at the gate. Officers later recovered a spent "Whistling Worm" firework in the area, but the origin of the firework is unknown. The defendant does not deny attempting to lock the gate, but denies setting off an explosive. (PSR ¶ 28).[2] See surveillance screenshot showing the explosion.



The defendant fled from the gate and took cover behind the same pillar. Federal officers gathered to attempt to arrest the defendant for causing the explosion and attempting to lock the gate. (PSR ¶ 29).

---

[2] On December 10, 2025, the defendant provided a video from social media that appears to support their position the defendant did not set off a firework or incendiary device.

**Government's Sentencing Memorandum**                                        **Page 4**

The defendant fled to the northeast when she was challenged by the federal officers. When confronted by the officers, she brandished a twelve-inch butcher knife and began to move the knife back and forth at the officers in a threatening manner. ICE surveillance video captured the defendant with the knife exposed threatening the federal officers. (PSR ¶ 29). See surveillance screenshot.



A neighbor watching the confrontation from a nearby apartment building balcony recorded the confrontation. The individual posted the video on social media and it was obtained by law enforcement. Below are screenshots showing the confrontation from the social media video, including a zoomed in screen capture showing the knife.

/ / / /



The defendant the moved further to the east and the officers continued to follow her. The officers yelled at the defendant to "drop the knife!" The defendant transferred the knife to her non-dominate hand and threw the knife in the direction of an FPS officer with a sidearm throw, missing the FPS officer by several feet. The officer believes that the defendant threw the knife at his head, but missed. See screenshots from the social media video. (PSR ¶ 29).



**Government's Sentencing Memorandum**                                    **Page 7**



One of the FPS officers responded by deploying his taser and the defendant fell to the

ground. (PSR ¶ 30). See screenshot.



/ / / /

The FPS officers attempted to place the defendant under arrest. The defendant tried to remove a second knife from her waistband as the FPS officers frantically tried to place her under arrest. The scene turned chaotic as other protestors attempted to intervene. Finally, after an extended struggle, the officers placed the defendant in handcuffs and escorted her back to the office. The individual filming this portion of the incident began to duck down below the balcony and the camera misses the majority of the defendant resisting, but below is one screenshot showing other protestors moving and the struggle with the defendant. (PSR ¶ 30).



/ / / /

Federal officers recovered both the knife that Winters threw at the officers and the knife she tried to remove from her waistband. See photos.



*(Brandished and Thrown Knife)*



*(Knife Removed From Waistband)*

The FBI interviewed the defendant after the incident. The defendant stated she had done nothing wrong and lived across the street from the ICE building. She claimed she was trying to sleep when bombs continually went off across the street. She said she was tased and beaten up

**Government's Sentencing Memorandum**                                                   **Page 10**

but had nothing else to say. The defendant did not explain why she covered her face with a mask, why she attempted to lock the ICE gate, why she brandished a large knife at the officers, nor why she threw a knife. (PSR ¶ 32).

### b. 25-cr-00390

The defendant was released over the United States' objection and almost immediately began to violate the terms of her release. Initially, Pretrial Officer Peru set a meeting at Pretrial Services on August 20, 2025 so the defendant could be served the summons for violating the terms of her pretrial release. The defendant tried to negotiate with Officer Peru and receive a guarantee that she would not be arrested if she showed up for her pretrial meeting. Officer Peru refused to make a deal with her. Judge You decided to issue an arrest warrant and not a summons, the U.S. Marshals were notified and asked to serve the arrest warrant when the defendant arrived at Pretrial Services. (PSR ¶ 34).

On August 20, 2025, two Marshals arrived in the lobby of Pretrial Services and attempted to place the defendant under arrest. The incident was captured by Marshal body cameras. The defendant immediately became hostile. She bull-rushed the Marshals and began to fight the Marshals attempting to escape and resist. The Marshals struggled with her for several minutes as she continued to fight back and not let the officers place her in handcuffs. With the assistance of several other Marshals, they were able to get handcuffs on the defendant and escort her to a Marshal holding cell. (PSR ¶¶ 35-36).

A short time later, several Marshals went to check on the defendant. The defendant had a mental health crisis and attempted suicide. The Marshals went in and began to provide immediate medical assistance. After approximately thirty to forty-five seconds, the defendant began to take labored breaths. The Marshals placed her in a recovery position on her side. Due to

**Government's Sentencing Memorandum**                                    **Page 11**

the medical incident, the Marshals removed the handcuffs and belly chain as they waited for medical personnel to respond. As soon as the restraints were removed, the defendant returned to fighting the Marshals. She began kicking the Marshals and flailing at them. The Marshals attempted to keep her in the recovery position and stop her from resisting. Portland Fire and AMR personnel arrived to assist. The defendant screamed, "You should have let me die!" and "You're trying to kill me!" (PSR ¶¶ 63-65).

While the medical personnel tried to provide aid, the defendant ripped off the blood pressure cuff cord and began fighting with the Marshals again. The Marshals tried to place handcuffs on the defendant again, and she grabbed AV2 (a U.S. Marshal) by the hair at the base of her scalp and began to whip AV2 around by AV2's hair. AV2 could not get the defendant to stop pulling her hair and free her head from the grip. A different Marshal delivered several close hand strikes to the defendant's legs, and she finally let go of AV2. AV2 suffered pain and soreness from the pulling hair. (PSR ¶¶ 64-65).

The defendant remained completely uncooperative as she was taken to the hospital. She remained uncompliant at the hospital by removing IV's and refusing medical care. The defendant remained at the hospital overnight for a psychological exam. The results of the exam are unknown to the United States. (PSR ¶ 65).

## II.    The Charges and Plea Agreement

The defendant pled guilty to Count 2 in 25-cr-284 and Count 2 in 25-cr-00390 on October 2, 2025 (PSR ¶¶ 1, 3). At the time the United States made the plea offer to the defendant, the government expected the defendant would remain in custody given her repeated and violent violations on pretrial release. Had the defendant remained in custody, she would have served approximately 6 months imprisonment, which the parties believed would be a low-

**Government's Sentencing Memorandum**                                    **Page 12**

end of the guidelines if the Court accepted the United States' proposed variances. The Court released the defendant and she will not have served the expected 6 months.  Nonetheless, the government will stand by the agreement and recommend credit for time served.

### III.    Guidelines Computation

The government agrees with the PSR calculation of the base offense level of 10.  USSG § 2K2.1(a)(1). (PSR ¶ 44). The defendant used a dangerous weapon and a three-level enhancement applies. (PSR ¶ 45). Defendant has shown acceptance of responsibility, so a two-level reduction applies, provided she continues to demonstrate acceptance of responsibility. USSG §3E1.1(a),(b) (PSR ¶ 61).  The government further recommends a two-level reduction under 18 U.S.C. § 3553(a) for pleading guilty quickly and waiving indictment.

| Combined Guidelines | | |
|---|---|---|
| USSG § 2A2.4 | Base Offense Level | 10 |
| USSG § 2A2.4(b)(1)(B) | Dangerous Weapon Enhancement | +3 |
| USSG § 3D1.3 | Combined Offense Level | +2 |
| USSG § 3E1.1(a) and (b) | Acceptance of Responsibility | -2 |
| 18 U.S.C. § 3553(a) | | -2 |
| | **Adjusted Offense Level** | 11 |

The parties incorrectly believed that there would only be a one-level enhancement would occur for the combined offense level. (PSR ¶ 58). The United States agrees that the PSR is correct and that a two-level enhancement applies.

### IV.    CRIMINAL HISTORY

While the defendant only has one prior conviction, her contacts with law enforcement show repeated assaultive behavior directed at law enforcement. Those incidents are described below.

**Government's Sentencing Memorandum**                                                    **Page 13**

### a.  2011 – Disorderly Conduct Arrest

Portland Police officers responded to the defendant being belligerent at a bar. The defendant was arrested for starting a fight inside the bar.  More troubling, were the defendant's comments towards law enforcement.  When asked how much alcohol she consumed, she responded by saying, "Enough to know that you're a fucking pig." After being arrested, the defendant told officers that if not for the handcuffs the defendant would manually choke the officer. The defendant was not charged for this incident. (PSR ¶ 72).

### b.  2014 – False Reporting Conviction

In 2014, she was convicted of a false reporting in Lincoln, Nebraska. The defendant was harassing runners participating in a marathon. Officers responded and found the defendant appeared intoxicated.  When they asked to have a seat in their patrol vehicle, the defendant responded, "No. That's not going to happen," and began to walk away. The officer attempted to detain the defendant, and the defendant resisted arrest. A physical struggle ensued, and the defendant was taken to the ground until finally being placed in handcuffs. After being arrested, the defendant provided a false name. (PSR ¶ 69).[3]

### c.  2019 – DUII Diversion

In 2019, the defendant crashed into a parked car. The defendant admitted to drinking and that she did not have a license. She was arrested and later pled guilty to a DUII Diversion in Multnomah County.  She completed her diversion and the case was dismissed. Remarkably, this is the only known incident where the defendant had contact with law enforcement and did not engage in violent, assaultive or resistive behavior.

---

[3] The United States was unaware of the facts of the 2011 Disorderly Conduct and 2014 False Reporting until the published in the PSR.

**Government's Sentencing Memorandum**                                                 **Page 14**

### d. 2024 – Assault on a Public Safety Officer (Pending)

In December 2024, the defendant was involved in a vehicle accident and police were dispatched to assist with a "combative subject." An officer arrived scene and the defendant initially appeared calm. The defendant expressed her unhappiness with the police's response to a burglary she reported earlier. She began to demand a "courtesy transport" to her residence. The officers explained they could not give a courtesy transport to her. The officer provided the defendant his business card and began to walk away. The defendant then ran at the officer at a full sprint and tackled the officer from behind. The defendant swung her arms at the officer's face and pushed the officer down. During the fight, the officer's glasses and earpiece were both broken. The Portland officers struggled with the defendant until they finally got her handcuffed. (PSR ¶ 73).

The defendant suffered injuries during the scuffle and was placed into an AMR ambulance for precautions. Portland officers handcuffed one of her hands to the gurney. During the transport, the defendant attempted to hit one of the paramedics. Paramedics then sedated her. At the hospital, the defendant removed her IV and ran out of her hospital room attempting to escape. Two officers grabbed the defendant and escorted her back to the hospital room and handcuffed her to the bed. (PSR ¶ 73).

A Portland Police supervisor later interviewed the defendant about the use of force. The defendant told the officer when the police walked away from her, she felt there was nothing else she could do but run at the officer. She admitted to grabbing the officer and refused to answer any more questions. (PSR ¶ 73).

The defendant was charged by Information in Multnomah County Circuit case number 24CR64708. The case languished with the State's inability to get the defendant a court appointed

**Government's Sentencing Memorandum**                                    **Page 15**

attorney. Multnomah County finally indicted the defendant on August 22, 2025 and the case is pending. (PSR ¶ 73).

### e. Capital Police Investigation

On June 9, 2025, North Dakota Senator Kevin Cramer's office received an e-mail from an individual making threatening statements. The sender's e-mail address was listed as "eatadick@republikklanmustdie.com." The message states, "You fucking diagusting [sic] lump of whyte [sic] supremacist garbage. I live in fargo [sic] and i [sic] will find you if you try and take any more food from these childrens [sic] mouths. do [sic] you understand? There will be a nice construction of 4x4's with a secure climbing rope w [sic] youe [sic] name on it. What the fuck is wrong w [sic] you you [sic] heartless soulless shitbag?" The message is obviously concerning by first the e-mail address which seems to say that all Republicans must die. Further, the vague threat about 4x4's with a rope appears to be a threat to hang Senator Cramer.

The Capital Police investigated the sender given the threats. The IP address from the sender comes back to a T-Mobile phone number. T-Mobile subscriber information shows the phone is in the defendant's mother's name. When the defendant was arrested on December 7, 2024, the defendant provided the same T-Mobile phone number subscribed to her mother as her number. The investigation is ongoing.

### f. Criminal History Score

Despite all of the mentioned incidents, the defendant only earned one criminal history point and is a Criminal History Category I. (PSR ¶ 71).

## V.    Pretrial Release Performance

The defendant made her initial appearance on June 26, 2025 in front of United States Magistrate Judge Youlee You. The government sought her continued detention as a risk of non-

appearance and a danger to the public, and the defendant sought release. A central concern immediately raised was the defendant's subsidized housing location across the street from the ICE building and the defendant's desire to return to her home. Judge You ordered the defendant to be detained as a danger to the public.

On July 8, 2025, the defendant was arraigned on the indictment and once again sought her release in front of United States Magistrate Judge Stacie Beckerman. Over the government's objection, Judge Beckerman released the defendant to the Northwest Regional Reentry Center (NWRRC). During the hearing, the defendant made it clear she wished to return to her residence. Judge Beckerman rejected her request to return to her residence. Judge Beckerman made it clear to the parties that if the wait was too long for the NWRRC, that she would support release to another location, such as Bybee Lakes. After the hearing, the parties were told the wait to enter the NWRRC would be several months. Arrangements were made for the defendant to be released to Bybee Lakes and Judge Beckerman ordered her release on July 17, 2025.

On August 1, 2025, the defendant returned to court once again asking to return to her residence. The government once again opposed. United States Magistrate Judge John Jelderks allowed the defendant to go back to her residence for only two hours to collect her personal items. He denied her request to move home, but said if she performed well for several months that the Court would consider allowing her to return home.

On August 17, 2025, Pretrial Services was notified that the defendant was no longer living at Bybee Lakes and moved back into her residence in violation of pretrial release conditions. This location is across the street from the ICE building and was discussed at every court appearance the defendant made. It was made abundantly clear that she was not allowed to move back into her residence, but the defendant chose to violate her conditions of release.

**Government's Sentencing Memorandum** **Page 17**

Pretrial Services Officer Peru learned that the defendant was no longer allowed to stay at Bybee Lakes due to numerous incidents and program violations she had at the facility. Via e-mail, the defendant told Officer Peru that a Portland Police officer gave her permission to move back into her residence after she was assaulted in downtown Portland.

The United States contacted the Portland Police and Multnomah County Sheriff's office to see if there were any reports of the defendant being a victim of an assault. There are no reports or information the defendant was a victim of an assault. Per defense counsel, the defendant said she generally reported the assault to an officer and the officer told her to "go home." If the incident even happened, an officer telling her to go home is not giving the defendant the authority to violate her federal release conditions. The defendant took the vague purported statement to blatantly violate her pretrial conditions.

While on release, the defendant posted videos on social media discussing her situation. During the videos, the defendant displayed her distaste and dislike of prosecutors and federal law enforcement. More troubling, on August 19, 2025, defendant released a video that began with her complaining about her case, her sentencing exposure, but turned more radical. She said, "the fucking Jihad needs to begin and we need to make it happen."

The Court released the defendant, and the violations continued. She continued to post online about law enforcement and her case, despite being forbidden from doing so. Officer Peru believes that the defendant and an associate serendipitously recorded Officer Peru without notifying Officer Peru.

The defendant's performance on pretrial release has not gone well. The defendant's repeated violations show that she does not take the Court's orders seriously. She continually

**Government's Sentencing Memorandum**                                    **Page 18**

looks for ways to circumvent the orders and really does not seem interested in complying with court orders.

### VI.    Victims' Positions

The United States discussed the case with the victims in both cases.  Both victims deferred to the prosecution team on a plea and sentence.

### VII.    Government's Recommended Sentence

The defendant has significant, repeated and violent responses to encounters with law enforcement. Through interviews and posts on social media, the defendant tries to portray herself as a victim.  Her statement to the PSR writer exemplifies her mistaken belief.  When discussing the incident at the ICE building, she said, "It's not like I went out looking for trouble. I lived next door to a war zone. These people showed up in my neighborhood and started shooting…I had a momentary lapse of reason…and my first instinct was to protect people…I've never been a violent person." (PSR ¶ 41). The defendant is untethered from reality.  When she went to the ICE building, armed herself with multiple knives, attempted to shield her identity by wearing a mask, and responded to law enforcement's confrontation with her by brandishing a large knife.  There is nothing about her actions that suggest she was attempting to protect anyone.  Rather, she appears to be a violent person as almost encounter with law enforcement solely surrounds violent and threatening behavior.

The defendant is the cause of every one of these violent encounters. She is the one that threatens officers.  She is the one that resists when law enforcement attempts to arrest her. She is the one that brandishes weapons when confronted. She is someone out looking for a violent confrontation, claims a loose association with Antifa, or as she said in one of her social media posts, "a fucking Jihad needs to begin and we need to make it happen." These are claims of

**Government's Sentencing Memorandum**                                    **Page 19**

someone that is either seeking a violent revolution or, more likely, someone dealing with significant mental health issues.

The defendant pulls an "Eddie Haskell." She will appear in court or in an interview with the PSR writer and give the impression that she is complying and doing everything the Court ordered her to do. The reality is, like Eddie Haskell, the defendant puts on a fake persona in court, when in the real world she is something completely different. The past ten years tell a very different story. She is someone that rages against law enforcement and fights violently against them whenever confronted.

Since the beginning of this case, we believe there are significant untreated mental health issues at play. The defendant has refused to participate in a mental health evaluation, including after the Court ordered her to complete one upon her release after the plea. She wants to pick and choose who will do the evaluation. The defendant wants to blame all of her issues on PTSD and the police for causing her PTSD. A legitimate psychological examination may dispute this core belief of PTSD, and the government believes that is likely why she refused to comply. The defendant displays all the symptoms of a borderline personality disorder, and it would explain her violent and unstable actions. (see PSR ¶ 98).

The defendant reports that she only has one friend, a sixty-seven-year-old former neighbor. (PSR ¶ 85). She lives an isolated life and appears to be enthralled with life on social media. Her social support consists of unknown individuals (acquaintances "around the world") on the internet that support her political views. *Id.* These are not prosocial relationships and will cause the defendant to further deteriorate into a fake world on the internet where anonymous people become keyboard warriors to say things online that they would never say in person. Unfortunately, the defendant takes the online comments to the real world.

**Government's Sentencing Memorandum**                                    **Page 20**

### a. Supervised Release Conditions

The government agrees with proposed Special Conditions, but requests to add the following additional special conditions. First, the government requests a condition of no communication about ICE or any law enforcement on the internet. Second, to enforce the condition of no communication about ICE or law enforcement, that she be ordered to comply with internet monitoring by probation. Without the ability to monitor her activity, it may be difficult to prove the defendant posted something written from one of the defendant's unknown accounts.

Finally, the government requests that a special condition that the defendant must fully participate in a mental health evaluation by January 16, 2026. Currently, the conditions do not require a mental health evaluation and only requires her to participate in a mental health treatment program. The defendant needs to have a full psychological evaluation by an actual doctor and not a social worker.

### b. Incarceration

The Government's proposed advisory guideline range is 8 to 14 months, factoring the recommended adjustments. While not bound by the Sentencing Guidelines, district courts must consult the guidelines and take them into account when sentencing. *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005). The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007). The guideline serves as "the starting point and the initial benchmark" in every sentencing proceeding and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Gall v. United States*, 552 U.S. 38, 49 (2007); *Rita*, 551 U.S. at 350. The guidelines serve as a "lodestone" at sentencing, and "cabin" or

**Government's Sentencing Memorandum**                                    **Page 21**

"anchor" a sentencing court's discretion. *Peugh v. United States*, 569 U.S. 530, 531 (2013). While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences." *Id*.

The parties incorrectly believed the defendant's guideline range would be 6 to 12 months. Had the defendant remained in custody pending sentencing, she would have served the low-end of 6 months. While the government was surprised by the Court's decision to release her, the United States will stand upon the agreed upon sentence of credit for time served. The defendant is dealing with significant issues and needs the 3 years of supervised release to protect the community.

## VIII.    Conclusion

Based on the foregoing, the Government recommends a sentence of credit for time served with 3 years of supervised release.

Dated: December 10, 2025.                              Respectfully submitted,

                                                                          SCOTT E. BRADFORD
                                                                          United States Attorney

                                                                          */s/ Lewis S. Burkhart*
                                                                          LEWIS S. BURKHART, OSB #082781
                                                                          Assistant United States Attorney

**Government's Sentencing Memorandum**                              **Page 22**